Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
5354 James Avenue
Oakland, CA  94618
Telephone:  (510) 601-1309
Email:  craigabrandt@att.net

Hans W. Herb (SBN 136018)
LAW OFFICE OF HANS W. HERB
P.O. Box 970
Santa Rosa, CA  95402
Telephone:  (707) 576-0757
Email:  hans@tankman.com

Attorneys for Plaintiff
EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>    vs.<br><br>TRANSENE COMPANY, INC., a Massachusetts corporation, doing business in California as Shape Products; ANTHONY WEILER, an individual, KRISTINA FENG, an individual, and DOES 1-10, inclusive,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

## INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendants for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about March 4, 2019, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to the Facility Manager of Defendant TRANSENE COMPANY, by certified mail, at 1127 57th Avenue, Oakland, California ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit "A" and incorporated herein by reference.

4.      More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.     Venue is proper because Defendants reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

7.     Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company in June of 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

8.     EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.   Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

9.      EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

10.     EDEN has members throughout northern California.  Some of EDEN's members reside and work near the San Leandro and San Francisco Bay (the "Receiving Waters" for Defendant TRANSENE COMPANY's Facility storm water run-off), and use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of these natural resources are specifically adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

11.     EDEN has standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendants' violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendants a 60-day Notice of Intent to Sue.

12.     Defendants' ongoing violations of the General Permit and the CWA will cause irreparable harm to EDEN and certain of its current members, for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and relief requested in this Complaint will not require the participation in this lawsuit of individual members of EDEN.

13.     EDEN is informed and believes, and on such information and belief alleges, that Defendant TRANSENE COMPANY, INC., doing business in California as Shape Products ("TRANSENE COMPANY") is located at 1127 57th Avenue in Oakland, California; was formed on or about August 17, 1965, as a Massachusetts corporation; registered on February 27, 2017, with the California Secretary of State as a Foreign Corporation; and is identified in the Regional Board's records as the Industrial General Permit applicant and operator of the Facility.

14.     EDEN is informed and believes, and on such information and belief alleges that Defendant ANTHONY WEILER is the Vice President and former Legally Responsible Person for the Facility according to the documents on file with the Regional Board.

15.     EDEN is informed and believes, and on such information and belief alleges that Defendant KRISTINA FENG is the Facility manager and current Legally Responsible Person for the Facility according to the documents on file with the Regional Board.

## STATUTORY BACKGROUND

16.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

17.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

18.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

19.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

20.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

21.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

22.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable

("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

23.    Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

24.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

25.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water

discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

26.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

27.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §I(1).

28.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

29.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

30.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

31.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

32.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

33.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

34.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

35.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

36.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

37.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

38.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

39.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

40.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

41.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual

NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

42.    When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

43.    For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

44.    Section XVI(A) of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

45.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate,

and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

46.    Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both. *See* also Clean Water Act section 309(c)(4)

San Francisco Bay Regional Basin Plan

47.    The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and beneficial uses for San Francisco Bay and its tributaries.

48.    The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish harvesting, fish migration, preservation of rare and endangered species, fish spawning, commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving contact with water, recreational activities involving proximity to water, and navigation. *See* Basin Plan, Table 2-1.

49.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

50.    Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges

of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the

waters receiving the discharges. WQS applicable to dischargers covered by the Storm Water

Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for

Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

51.     The Basin Plan sets forth, among other things, narrative WQS for floating

material, O&G, sediment, settleable matter, and suspended materials, and sets forth numeric

WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium,

silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21,

and Table 3-3.

52.     The Basin Plan also includes site specific objectives ("SSOs"), which are WQS

for specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

Table 3-3A. The CTR includes numeric criteria set to protect human health and the environment

in the State of California.

53.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan

standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section

VI(A) of the General Permit.

Citizen Suit Provision of the CWA

54.     Under the CWA, any citizen may commence a civil action against any person

who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order

issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action

may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation

(i) to the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and

(iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By

including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

55.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192 per day for each violation occurring before November 2, 2015, and $51,570.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

56.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

**FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

57.     Defendant TRANSENE COMPANY, doing business as Shape Products, manufactures chemicals for the electronics industry, including wet chemical etchants for metals and dielectrics, photoresists and photoresist ancillary chemicals, electroless and electrolytic plating solutions, conductive and insulative epoxies, silicones, photomask chemicals, encapsulants, and cleaning chemicals.

58.     The Facility routinely utilizes toxic heavy metals in its daily operations, such as Aluminum, Chromium, Copper, Iron, Nickel, Silver and Zinc; as well as inorganic chemicals,

including nitric acid, sulfuric acid, hydrochloric acid and sodium hydroxide, at a volume of up to 2,000 gallons on-site at all times.

59.     EDEN is informed and believes that the Facility falls under standard industrial classification ("SIC") code 2819 (Industrial Inorganic Chemicals, NEC).

60.     EDEN is informed and believes that TRANSENE COMPANY stores industrial materials outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

61.     Based on EDEN's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and EDEN's information and belief, storm water is collected and discharged from the Facility through a series of channels that discharge via at least one outfall.  The outfall discharges storm water and pollutants contained in that storm water directly into the San Pablo Bay, which flows into the San Francisco Bay, both navigable Waters of the United States.

62.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

63.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to

prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP and Site Map

64.    On information and belief, Plaintiff alleges that since at least July 1, 2015, Defendants have failed to implement an adequate SWPPP for the Facility.

65.    Defendants failed to develop and implement *any* SWPPP for the Facility until April 29, 2019, nearly two months after Defendants received Plaintiff's Notice of Intent to Sue.

66.    Plaintiff is informed and believes, and thereupon alleges, that the Facility's current SWPPP does not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT for the Facility.

67.    Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Sections X(G)(1)(e), X(G)(2), and X(H) of the General Permit.

68.    According to information available to EDEN, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

69.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

70.    Specifically, the Facility's SWPPP fails to include BMPs for the heavy metals utilized by the Facility in its industrial operations, including Aluminum, Chromium, Copper, Iron, Nickel and Silver.

71.     Furthermore, the Facility utilizes inorganic chemicals in its industrial operations, including nitric acid, sulfuric acid, hydrochloric acid and sodium hydroxide, at very high volumes.  However, the SWPPP indicates erroneously the Facility is a manufacturer of *organic* chemicals, rather than *inorganic* chemicals.

72.     In addition, the Facility's Site Map fails to indicate the location of the Facility's storm water sampling location(s).

73.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the San Francisco Bay.

74.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged in this Complaint are ongoing and continuing.

Monitoring and Reporting

75.     On information and belief, EDEN alleges that Defendants have an inadequate monitoring program at the Facility.

76.     On information and belief, EDEN alleges that during the 2015-2016 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

77.     On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

78.     On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendants failed to collect and analyze two storm water samples from the first half of the reporting year and two storm water samples from the second half of the reporting year.

79.     On information and belief, EDEN alleges that during the 2018-2019 reporting year to date, Defendants failed to collect and analyze two storm water samples at its Facility from the first half of the reporting year.

80.     On information and belief, EDEN alleges that Defendants have failed to conduct regular monthly visual observations of storm water discharges at the Facility since at least July 1, 2015, and to contemporaneously complete and retain Visual Observation Reports with the Facility storm water data.

81.     EDEN is informed and believes that Defendants have failed to analyze the Facility's storm water samples for the required parameters, in violation of Section XI(B)(6) of the General Permit.  Specifically, Section XI(B)(6)(d) of the General Permit requires additional sampling parameters of aluminum, iron and nitrite+nitrate (total nitrogen), which are required based on the Facility's true SIC code of 2819 (Industrial Inorganic Chemicals).

Falsification of Annual Reports

82.     EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit.

83.     Specifically, on June 18, 2017, and June 26, 2018, TRANSENE COMPANY submitted its Annual Reports for the Fiscal Years 2016-17 and 2017-2018, respectively.  These Reports were signed under penalty of law by Defendant Anthony Weiler.

84.     Defendant Anthony Weiler responded "Yes" to Question No. 3 on both of the Annual Reports ("Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?")

85.     Section XI.B of the General Permit provides that Dischargers must collect and analyze two storm water samples in the first half of each reporting year, and two samples in the second half of each reporting year.  However, as discussed above, Defendants failed to collect and analyze *any* storm water samples during the 2016-17 or the 2017-18 reporting years.

86.     If a Facility does not collect four storm water samples during a particular reporting year, the reporting requirements of the General Permit require the Discharger to indicate "NO" to Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected.

87.     Based on the foregoing, it is clear that Defendant Anthony Weiler intentionally made false statements in the Facility's 2016-17 and 2017-18 Annual Reports when he indicated that the Facility had collected samples according to Section XI.B of the General Permit during the reporting years when in fact the Facility did not collect any samples.

Failure to Implement BAT/BCT and BMPs

88.     EDEN is informed and believes that Defendants have failed to identify and implement Best Management Practices ("BMPs") at the Facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

89.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Discharges of Contaminated Storm Water

90.     Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

91.     Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendants are discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

92.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

93.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

94.     As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for the Facility.

95.     Each day that Defendants fail to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

96.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

97.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

98.     As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility.

99.     Defendants' ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

100.    Each day since at least July 1, 2015, that Defendants have failed to develop and implement an adequate monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

101.    Noncompliance with the General Permit constitutes a violation of the CWA against all Defendants. General Permit § XXI.A; 33 U.S.C. § 1342.

## THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

102.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

103.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L) which provides significant penalties for submitting false information.

104.    Specifically, Clean Water Action section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment of two years, or both.

105.    As delineated herein, Defendant Anthony Weiler made false representations in the Facility's Annual Reports for the reporting periods 2016-17 and 2017-18 by reporting that the Facility had sampled the required number of QSEs during the reporting years for all discharge locations, in accordance with Section XI(B) of the General Permit.

106.    At the time that Defendant Anthony Weiler made the false representations referred to above, he knew or should have known that the representations were false but proceeded nonetheless to certify under penalty of law to the Regional Water Board that the information contained in the Annual Reports was true and correct.

107.    Each time that Defendants have submitted false statements to the Regional Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

108.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

109.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

110.    Defendants failed to implement BAT and BCT at the Facility for its discharges of Iron, TSS, Zinc, Nitrates, Aluminum, Copper, and other potentially un-monitored pollutants, in violation of Effluent Limitation V(A) of the General Permit.

111.    Each day since at least July 1, 2015, that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

112.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

113.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

114.    Plaintiff is informed and believes, and thereupon alleges, that since at least July 1, 2015, Defendant TRANSENE COMPANY has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

115.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at both facilities, becoming contaminated with iron, sediment, zinc, nitrates, phosphorus and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

116.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

117.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

118.    Every day since at least July 1, 2015 that Defendants have discharged and continues to discharge polluted storm water from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.  These violations are ongoing and continuous.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.      Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.      Enjoin Defendants from discharging pollutants from Defendant TRANSENE COMPANY's Facility to the surface waters surrounding the Facility until such time as TRANSENE COMPANY has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.      Order Defendants to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities at TRANSENE COMPANY's Facility;

6.      Order Defendants to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendants was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendants undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.

Dated:  May 6, 2019                              Respectfully,


By: ___/S/ Craig A. Brandt_____
        Craig A. Brandt
        Attorney for Plaintiff